# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| Cornerstone Advisors of Arizona LLC, A Delaware Limited Liability Company,<br><br>  Plaintiffs,<br><br>  v.<br><br>Trisa Wetzel, Amy Martel, and Engage fi, LLC a Florida Limited Liability Company<br><br>  Defendants. | Case No. 8:24-cv-00517 |

## DECLARATION OF TRISA WETZEL IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

I, Trisa Wetzel, state as follows:

1. I make this declaration based on my personal knowledge and of my own free will.

2. Though I had assistance in formalizing this declaration, the information herein reflects my personal knowledge of the matters set forth in the declaration.

3. While I am prepared to testify about additional matters at the trial in this lawsuit, I am preparing this declaration to present specific facts to be used in response to motions for summary judgment. This declaration is not the limit of my knowledge nor the limit of my intended testimony at trial.

4. I am Senior Vice President of Client and Partner Relations for Engage fi, LLC ("**EFI**").

1

5. I have been in the financial services industry for my entire career, beginning with working on the client side at a bank, then transitioning to a technology vendor before joining a financial services consulting firm, Next Step International, Inc. ("**NSI**") as a principal in 1995.

6. During my three decades as a consultant, I have personally overseen more than 1,500 successful system conversions for varying types of technologies on behalf of financial institutions all over the country.

7. While NSI was still a startup, I did not have an employment agreement, but instead worked as an independent contractor. I was not officially employed by NSI until 2006.

8. Amy Martel was hired as a consultant by NSI in September of 2019, after being a client for nearly a decade. She oversaw the contract evaluation and conversion teams.

9. NSI was purchased by Cornerstone Advisors of Arizona, LLC ("**Cornerstone**") in 2021, and the entire team transitioned over to Cornerstone.

## RFP

10. Early on, NSI's founder, Peter Jeye, created a multi-thousand question Request for Proposal ("**RFP**") that NSI sent to every technology vendor with whom a client was considering contracting.

11. The RFP was resent on each new engagement, regardless of whether the vendor had previously responded to the standard question set for another bid, though

additional questions were added on top of the standard asks depending on the client's individual needs.

12.     Neither Ms. Martel nor I had any involvement with compiling the RFP questions or making any edits to that document. NSI employed a technical writer who did the majority of the drafting.

13.     Ms. Martel and I (along with many other members of the team) found the RFP to be overly long, a sentiment reflected by frequent feedback from vendors and clients who found it cumbersome. Vendors would not take the time to provide fulsome answers (generally copying and pasting), and clients generally did not have the time to devote to digesting the entire document.

14.     After NSI was acquired by Cornerstone, the NSI team remained segregated, finalizing business we had already sold or begun to sell before the sale and working on new matters in a silo.

15.     It did not appear that Cornerstone had any interest in using the RFP.

16.     When I transitioned from Cornerstone to EFI, EFI made it clear that if they were going to issue RFPs for core banking technology at all, the RFPs would need to be streamlined. In fact, before I was hired, Andres Pasantes specifically called out the length of the NSI RFP and we agreed that EFI would never issue something so onerous to vendors.

17.     I did not assist in drafting the new EFI standard or custom RFPs. Ms. Martel and I left that important work to the team EFI had assembled.

## Conversion Services Addendum

18. In the late 90s, while I was providing independent contractor services for NSI, I worked with the help of attorneys that the financial institutions and vendors hired to represent them during the vendor contract negotiation process to develop my best practices to protect the client into contract language. The goal was to clearly set forth vendor responsibilities and insert important provisions like capping costs.

19. Eventually, we settled on language with the lawyers that NSI routinely inserted into contracts that the vendors had with our financial institution clients to create a "conversion services addendum" that could be dropped into the contracts entered into between the banks and the vendors.

20. In the past twenty years, I have seen versions of the language I helped to develop appear in contracts not negotiated by NSI. I have also heard from attorneys I have worked with that they not only reuse the language themselves, but also have received from attorneys on the other side of deals, draft contracts containing the exact or very similar provisions to the ones that I helped to create.

21. I have never taken issue with my conversion services best practices terminology being recycled, as it only furthers the original goal of that language: to protect clients in the conversion process.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that factual allegations in the foregoing Declaration are true and correct to the best of my knowledge or information and belief. I understand that this verification is made subject to the penalties of perjury under 18 U.S.C. §1621 (relating to unsworn falsifications to authorities).

Dated:  December 20, 2024

/s/ *Trisa Wetzel*
Trisa Wetzel